1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11  CANDACE CLARKE,                )
                                   )
12             Plaintiff,          )
                                   )        No.  CV-06-229-HU
13        v.                       )
                                   )
14  MULTNOMAH COUNTY, NANCY        )
    WINTERS,                       )        OPINION & ORDER
15                                 )
               Defendants.         )
16  ─────────────────────────────  )

17  Elizabeth Farrell
    Attorney at Law
18  P.O. Box 3614
    Hillsboro, Oregon 97123
19
20        Attorney for Plaintiff

    Agnes Sowle
21  COUNTY ATTORNEY - MULTNOMAH COUNTY
    Kathryn A. Short
22  ASSISTANT COUNTY ATTORNEY
    501 S.E. Hawthorne Blvd., Suite 500
23  Portland, Oregon 97214

24        Attorney for Defendants

25  HUBEL, Magistrate Judge:

26        Plaintiff Candace Clarke brings this 42 U.S.C. § 1983 action

27  against her former employer, Multnomah County, and her former

28  supervisor Nancy Winters.  Plaintiff brings a First Amendment

    1 - OPINION & ORDER

retaliation claim against both the County and Winters, an Oregon statutory whistleblower claim against the County, and a common law wrongful discharge claim against the County.

Defendants move for summary judgment against all claims. Plaintiff concedes the wrongful discharge claim, but opposes the motion in all other respects. All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I grant defendants' motion.

BACKGROUND

Plaintiff was hired by the County on June 28, 2004, as Business Manager in the Mental Health & Addiction Services Division (MHASD), part of the County's Department of Human Services. Nancy Winters was her immediate supervisor, and Al Stickel, Chief Financial Officer of the Human Services Department, supervised her on fiscal matters.

Plaintiff's job duties included managing and leading the "fiscal team" and coordinating the business services activities within MHASD, facilitating the fiscal, administrative, and budgetary tasks, synthesizing and directing the processing of information impacting program expenditures and revenues, and ensuring that all internal controls and applicable federal, state, local, and private funding sources, policies, and reporting requirements were maintained.

Plaintiff contends that comments she made during her tenure about four different topic areas were the basis for her termination. They are: (1) ITAX, (2) Cascadia Behavioral Health, (3) ITS overpayment, and (4) a projected 9.1% decrease in Medicaid

2 - OPINION & ORDER

1  funding.

2      A.   ITAX

3      Before plaintiff began working for the County, county citizens

4  passed a measure approving a personal income tax, commonly referred

5  to as the "ITAX."   During her employment with the County, in

6  approximately July 2004, county employee Dr. Peter Davidson told

7  plaintiff that MHASD had received funding from the County's ITAX

8  and that the state had also partially restored funding for the same

9  services.  Plaintiff believed that it was illegal for the County to

10 keep both the ITAX funds and the partially restored state funding.

11     Plaintiff talked to both Winters and Stickel about her

12 concern.   Plaintiff states that Winters acknowledged that the

13 County had an "embarrassment of riches" as a result of receiving

14 the two sources of funds.  Plaintiff states that Winters acted

15 impatiently toward her, telling her to "let it go."

16     Stickel apparently informed plaintiff that Patty Pate, then

17 Director of the County's Human Services Department, was aware of

18 the issue and that Pate had talked to the County Chair's office

19 which had instructed the Department of Human Services to return

20 $500,000 of the ITAX to the County's general fund and to keep the

21 remaining funds.  Plaintiff asserts that Stickel did nothing to

22 alleviate her concern that it was wrong and illegal for the County

23 to keep the money from both sources.  Plaintiff states that she

24 also spoke to Keith Mitchell, her subordinate, about the ITAX issue

25 and he told her that the County had used the excess money to fund

26 a number of different projects, including "cultural competency," in

27 order to buy support from minority voters.

28 / / /

3 - OPINION & ORDER

1    B.  Cascadia Behavioral Health

2        The County contracts with Cascadia to provide mental health

3    services.  Early on in plaintiff's tenure with the County, Stickel

4    told her that the County was concerned that Cascadia would request

5    funds in addition to what had been contracted.  Plaintiff states

6    that Stickel told her she needed to watch Cascadia and make them

7    "toe the line."  Exh. 1 to Short Declr. (Pltf's Depo.) at pp. 18-

8    19).  Plaintiff asserts that Stickel told her he was still upset

9    about  a recent "bail out" payment the County had made to Cascadia

10   some time in December 2003.  Many county employees had frequent

11   discussions about Cascadia's request for additional funds.

12       Winters  states  that  although  there  were  criteria  in  the

13   Cascadia contract which provided for additional payments, county

14   management  agreed  that  when  Cascadia  requested  additional  funds,

15   the County would verify the specific need for those funds.  Winters

16   Declr. at ¶ 7.

17       In November - December 2004, Cascadia asked for additional

18   funds  outside  of  those  contracted  for,  for  its  crisis  outreach

19   program.  Mitchell, at the time a "Financial Specialist Senior" who

20   reported to plaintiff, confirmed that the crisis outreach program

21   had not had an increase from the County in four years.  Mitchell

22   Declr. at ¶ 6.

23       In  response  to  the  request,  plaintiff  formed  a  finance

24   committee consisting of plaintiff, Stickel, Mitchell, and a person

25   named Chris Yager.  The finance committee's purpose was to review

26   the request and gather information.

27       The finance committee told Cascadia that the committee was

28   going  to  recommend  that  the  County  not  pay  Cascadia  additional

4 - OPINION & ORDER

funds.    Plaintiff told Winters about the recommendation, and the finance committee reported the recommendation to the entire management team, including Mitchell, Winters, and others.

After this report to the management team, Winters convened a smaller group, consisting of herself, plaintiff, Debra Keever (Cascadia's Chief Financial Officer), Leslie Ford (Cascadia's Director), and at least one clinician.  This group was formed to obtain a broader view of the situation by including clinical staff in addition to the finance staff that plaintiff had assembled, and ultimately to determine whether to provide Cascadia with additional funds.

Cascadia re-stated their case to the new group and either brought in new clinical information, or at least more fully developed the clinical part of their proposal, in support of the request for additional funds.  Seth Lyon, a county clinical employee, supported Cascadia's position for additional funds.  In the end, the County provided an increase in funding to Cascadia, based on the need for and value of the crisis program.  The decision was based on clinical data and a decision that the County could not afford to lose the program and needed to support it completely.  Winters Declr. at ¶ 11.

During a meeting of this group, Winters asked plaintiff if she had changed her mind about the finance committee's recommendation that Cascadia not be provided with any additional county funds, and plaintiff responded, "no."  Plaintiff believed that Winters appeared mad at plaintiff for this response.

Plaintiff states that after that meeting, she "squealed" on Winters by going to Stickel.  Pltf's Depo. at p. 118.  She alleges

5 - OPINION & ORDER

that Stickel then told Pate, his boss, and they decided to attend Winters's next management meeting. Id. at p. 119. According to plaintiff, Pate and Stickel were going to come and tell Winters, "in front of everybody," that Cascadia was committing fraud. Id.

As best as can be gleaned from the summary judgment record, this concern about "fraud" arose out of an email exchange started by Keever on January 24, 2005. Exh. B to Farrell Declr. Keever sent an email to plaintiff, Stickel, Winters, and Lyon regarding Cascadia's financial statements for November and December 2004. Id. At the end of this email, she stated that she had sent the proposed budgets for crisis programs for 2004-05 and asked if they would let her know if there were any questions regarding the budgets and when could Cascadia expect to know if the submitted budgets would be funded. Id.

Plaintiff sent an email to Stickel and Winters within thirty minutes of receiving the email from Keever, and said that

> [r]egarding Debra's question of when Cascadia would be funded, where I left off was that Finance Team recommended no catch-up payments be made to Cascadia. . . . Then on 12/1/04 there was a joint meeting . . . . Cascadia laid out their request for increased funding . . . . Now it does sound like there have been clinical discussions that lead Cascadia to understand that they will be receiving a catch-up payment. . . . Could someone please brief me in writing of what Multnomah County's current position is regarding Cascadia catch-up payments?

Id.

That night, Stickel emailed plaintiff and Winters and said that the use of the term "catch up payments," implied that there were some funds that had not been delivered and that some accelerated payments were needed to bring things into balance. Id. Stickel did not recall ever having agreed to giving Cascadia "catch

6 - OPINION & ORDER

up payments" and wondered if this were Keever's terminology? Id.
He said he had no idea who "on the program side," gave Cascadia the
impression it was eligible for any additional funds. Id.

The next morning, Winters emailed plaintiff and Stickel and
said that there were no promises "made in that meeting," but by the
time the meeting was over "we had come within about 125K difference
between what they need and what they are getting from us." Id.
She then stated that sometime after that, "we" came up with about
80K "we had 'left over' from other money we got from the state, and
took out about 80K to put toward the crisis services, once they
invoiced us . . ., which we just got and will be paying." Id. She
continued that no promises were made, but that 'we' would try to
pay them a little more every time we end up with some money to do
that with." Id.

Plaintiff then responded in an email to Winters and Stickel
that she was still bothered by Cascadia's use of the word
"accrued," which I presume appeared in the actual financial
statements Keever sent because it is not a word used in the text of
her email. Plaintiff explained that in accounting "lingo,"
"accrued" meant that Cascadia was representing to its auditors and
Board that this money is contractually owed by the County. Id.
Plaintiff noted in this email that this "was the point of
escalation for Patty Pate" who is an accountant because she
understood that Cascadia was treating the difference of opinion as
a done deal in Cascadia's favor. Id. She stated that "[t]his
practice is not GAAP compliant, and in fact, is considered fraud."
Id.

Winters then responded to plaintiff and Stickel that she "gets
7 - OPINION & ORDER

your point now." <u>Id.</u>  She said that she was fine with however they re-set the boundaries as long as "we can send them money when we can, until we get a more realistic budget number (in the next budget) to pay them some increase for crisis that they haven't had in years." <u>Id.</u>

Plaintiff then wrote to Stickel and Winters and said, "[w]ell, Al, we'd better be clear, on letterhead, in this next communication to Cascadia." <u>Id.</u>  She noted that "Cascadia must cease and desist using an accrual process regarding this issue with the County." <u>Id.</u>  Stickel responded to plaintiff, but not to Winters, and asked that plaintiff draft something that could be taken to Winters and that Winters had to be a signer.  <u>Id.</u>  He then stated that "I am concerned that she will have a problem with it because she is still trying to spoon feed money to them without insisting on accountability." <u>Id.</u>  The last email communication about this in the record is a few days later when plaintiff emailed Stickel that "[w]e have a bigger problem than that.  Let's talk." <u>Id.</u>

Plaintiff contends that she was treated differently because she brought up concerns about the County's paying Cascadia additional funds.  She contends that Winters stopped her meetings with plaintiff, was unfriendly to plaintiff, and did not include plaintiff in the budget process, which began in January 2005. Plaintiff believed Winters no longer trusted her because of her involvement with the finance committee and her recommendation to not provide Cascadia with the additional funds.

C.  ITS Overpayment

In January 2005, Ralph Summers, Medicaid Policy Manager for the Addiction and Mental Health Division of the Department of Human

8 - OPINION & ORDER

Services for the State of Oregon, told plaintiff that there was a potential overpayment issue regarding the amount the state had paid the County to run the Intensive Treatment Service Program (ITS). Summers told plaintiff that it appeared that the claims payment data did not match the contractual limit on the number of children to be enrolled in the ITS program at any one time. Summers Declr. at ¶¶ 2, 3. Summers told plaintiff that the state did not perceive any intentional misconduct on the part of the County and that it was not initiating a referral to the Medicaid fraud investigation unit. Id. at ¶ 5. His purpose in telling plaintiff was to make her aware of the issue and to ensure she was involved in its resolution. Id. at ¶ 3.

Before Summers communicated this information to plaintiff, Ellen Pimental, who worked with Summers, had already contacted Tom Wirshup, a mental health consultant with MHASD, about this potential overpayment issue. Wirshup Declr. at ¶ 2. At a December 4, 2004 meeting, Pimental provided Wirshup with data regarding the billing issue. After that meeting, Wirshup gathered additional data to report back to the state. Id. at ¶ 3. He gave that data to plaintiff in January 2005. Id. at ¶ 4.

Within a day of talking with Summers, plaintiff reported the information Summers had told her, to Winters. Winters instructed plaintiff to work with Amy Baker, who supervised the ITS program, to review the documentation and negotiate with the state to try and reduce the amount the state claimed it had overpaid. The ITS billing issue was discussed openly at management team meetings. The record suggests that plaintiff and Baker disagreed about the issue to some extent, with Baker proposing that other services be

9 - OPINION & ORDER

counted toward the ITS program to adjust billings and reduce the overpayment to zero.  Plaintiff disagreed with that approach and apparently voiced her disagreement.

Plaintiff was successful in reducing the amount the state alleged was improperly billed.  The state initially requested approximately $700,000 in repayment, and plaintiff worked to reduce that amount to approximately $280,000, which represented an adjustment over the life of the program of 3.2%.

D.  9.1% Decrease in Funding

In fiscal year 2005, the state provided the County with $29.5 million to fund the Oregon Health Plan (Medicaid).  In November or December 2004, at a "Rates and Finance" meeting, plaintiff learned about a projected 9.1% decrease in state funding.  Plaintiff believed that the County's fiscal year 2006 budget should reflect the projected 9.1% decrease in Medicaid funding from the state for mental health services.  Plaintiff reported the projected decrease to Winters, Stickel, and to managers at management meetings.

Plaintiff spoke with Mitchell, who said that the proposed decrease was not reflected in the budget because funding from the state fluctuates and it is difficult to pin down exact numbers early in the budget cycle.  Plaintiff told Winters that Mitchell was not reflecting the 9.1% decrease in the budget.  Winters believed that Mitchell was right to follow the process he was doing because he had been with the County for a long time and knew what he was doing.

Additionally, the County's Central Budget Office prepared a "Budget Preparation Manual for FY 2006," which provided that "[f]or our budget planning purposes, the County will assume that state-

10 - OPINION & ORDER

funded programs will receive the same amount of state funding that is currently appropriated." Exh. 3 to Short Declr. at p. 4.  In fiscal year 2006, the state ultimately provided the County with $33.5 million in Medicaid funding, an increase in funding of approximately 13.8%.

Plaintiff contends that she was treated differently because she insisted that the 9.1% decrease in state revenue be included in the proposed budget.  She contends that Winters stopped her meetings with plaintiff, was unfriendly to plaintiff, and did not include plaintiff in the budget process, which began in January 2005.

Winters states that plaintiff's conduct demonstrated to Stickel and to Winters that plaintiff was not the right fit as the business manager.  Winters Declr. at ¶ 13.  According to Winters, Stickel was concerned that plaintiff did not have the knowledge base to handle her position.  Id.  Winters further states that she herself had lost faith that she and plaintiff could work together. Id.

Winters also states that she and Stickel decided together to terminate plaintiff's employment for numerous reasons, including her lack of follow-through on projects, her overreaction to issues that were insignificant to management, including a proposed job title change, and her interpersonal skills, such as "bad mouthing" Winters in a staff meeting, embarrassing Winters in a meeting with Cascadia, and an inability to get along with staff.  Id. at ¶ 14. Winters states that staff often complained to her, and others in management, that plaintiff was getting nothing done.  Id.

Plaintiff points out that both of the performance evaluations

11 - OPINION & ORDER

she received during her employment with the County were positive. The evaluations show that after three months, in early October 2004, Winters rated her as exceeding expectations and noted the following attributes: organized, competent, team player, positive attitude, and professional. Exh. E to Farrell Declr. In December 2004, at six months, her rating went down to "meets expectations." Exh. F to Farrell Declr.

Plaintiff also notes that she received positive feedback on her job performance from county counsel Patrick Henry and Kathy Shumate, the Quality Management Coordinator for Commitment Services.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and

1  designate facts showing an issue for trial.  <u>Celotex</u>, 477 U.S. at

2  322-23.

3      The substantive law governing a claim determines whether a

4  fact is material.  <u>T.W. Elec. Serv. v. Pacific Elec. Contractors</u>

5  <u>Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as

6  to the existence of a genuine issue of fact must be resolved

7  against the moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith</u>

8  <u>Radio</u>, 475 U.S. 574, 587 (1986).  The court should view inferences

9  drawn from the facts in the light most favorable to the nonmoving

10 party.  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630-31.

11     If the factual context makes the nonmoving party's claim as to

12 the existence of a material issue of fact implausible, that party

13 must come forward with more persuasive evidence to support his

14 claim than would otherwise be necessary.  <u>Id.</u>; <u>In re Agricultural</u>

15 <u>Research and Tech. Group</u>, 916 F.2d 528, 534 (9th Cir. 1990);

16 <u>California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,</u>

17 <u>Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).

18 I.  Section 1983 Claim against the County

19     There are three ways for a plaintiff to establish municipal

20 liability in a section 1983 claim.  <u>Trevino v. Gates</u>, 99 F.3d 911,

21 918 (9th Cir. 1996).

22          First, the plaintiff may prove that a [municipal]
           employee committed the alleged constitutional violation
23         pursuant to a formal governmental policy or a
           longstanding practice or custom which constitutes the
24         standard operating procedure of the local governmental
           entity. Second, the plaintiff may establish that the
25         individual who committed the constitutional tort was an
           official with final policy-making authority and that the
26         challenged action itself thus constituted an act of
           official governmental policy. Whether a particular
27         official has final policy-making authority is a question
           of state law. Third, the plaintiff may prove that an
28         official with final policy-making authority ratified a

13 - OPINION & ORDER

subordinate's unconstitutional decision or action and the basis for it.

Id. (internal quotation omitted).

The County contends it is not liable because there is no evidence that any county employee acted pursuant to an unconstitutional custom, policy, or practice affecting the terms of plaintiff's employment. Plaintiff fails to identify any alleged custom, policy, or practice in her Complaint, and notably, fails to even respond to this argument in response to defendants' summary judgment motion. Operating on the assumption that the practice plaintiff puts at issue in the Complaint is one of discharging employees who report alleged illegal and unethical fiduciary practices, defendant argues that plaintiff fails to come forward with evidence that a county employee acted pursuant to "a widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage' with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (internal quotation omitted).

Plaintiff submits no evidence that the County maintained any policy, much less a "settled policy" of discharging employees who report alleged illegal and unethical fiduciary practices.[1] Her own

---

[1] At oral argument, plaintiff suggested that the challenged custom, policy, or practice is the County's practice of "behaving in a manner" suggestive of fraudulent activity. The problem with this argument is that even if it were true, it is not a custom, policy, or practice that amounts to a constitutional violation. The constitutional violation at issue in the case is one of terminating an employee in retaliation for the exercise of the employee's First Amendment rights to free speech. Any other alleged policy, practice, or custom is simply not relevant to establishing County liability for this claim.

14 - OPINION & ORDER

instance of termination is insufficient to meet her obligation to establish liability on a custom, practice, or policy theory.  <u>See City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823, 24 (1985) (proof of single incident of unconstitutional activity is generally not sufficient to impose municipal liability).

Next, the County argues that it is not liable because there is no evidence that an official with final policy-making authority committed the alleged constitutional tort.  In her Complaint, plaintiff alleges that the "actions of Defendant Winters represented official policies, practices, customs, and usages of Multnomah County."  Compl. at ¶ 16.

As noted above, whether a particular official has "final policy-making authority," is a question of state law.  In support of its motion, the County submits evidence that the County's charter and county ordinances specify that the County Chair is the final policy-maker for the purposes of employment policies.  Exh. 4 to Short Declr. at p. 5 (providing that the County Chair is the "chief executive officer and personnel officer of the County"); <u>see also</u> Exh. 5 to Short Declr. (Executive Rule No. 270 "Personnel Rules", adopted 9/9/02 by Diane Linn, County Chair).

Plaintiff provides no evidence in support of the assertion in her Complaint that Winters was a final policy-maker for the County for personnel decisions.

Finally, the County argues that it is not liable because there is no evidence that a final policy-maker ratified the allegedly unconstitutional conduct of Winters.  In her Complaint, plaintiff alleges that the County "was aware of" and "approved" the unconstitutional conduct of Winters.  Compl. at ¶ 17.

15 - OPINION & ORDER

1   As noted above, municipal liability may rest upon proof of
2   ratification of unconstitutional conduct by an official with final
3   policy-making    authority    where    the    policy-maker    ratified    a
4   subordinate's unconstitutional decision or action and the basis for
5   it.  Trevino, 99 F.3d at 918.  To hold the County liable under this
6   theory, plaintiff must demonstrate that the County Chair, the final
7   policy-maker    for    employment    policy    for    the    County,    approved
8   Winters's alleged retaliatory discharge and the underlying basis
9   for it.  Praprotnik, 485 U.S. at 127.

10   Plaintiff  fails  to  submit  any  evidence  in  support  of  her
11   ratification allegations.   She  fails  to  respond  to  any  of  the
12   County liability arguments, no matter what the theory.

13   Because plaintiff fails to create an issue of fact regarding
14   the County's liability for the First Amendment retaliation claim,
15   I grant the County's motion.

16   II.   Section 1983 Claim against Winters

17   To succeed on a First Amendment retaliation claim, plaintiff
18   must  show  that  (1)  she  engaged  in  constitutionally  protected
19   speech; (2) the employer took adverse action against her; and (3)
20   her speech was a "substantial or motivating" factor in the adverse
21   action.   Freitag v. Ayers, 468 F.3d 528, 543 (9th Cir. 2006),
22   petition for cert. filed, 75 U.S.L.W. 3410 (U.S. Feb. 1, 2007) (No.
23   06-1085).

24   A.   Constitutionally Protected Speech

25   Generally, the expression of a public employee is protected by
26   the First Amendment if it relates to a matter of public concern and
27   if, under a balancing test established in Pickering v. Board of
28   Education, 391 U.S.  563 (1968), the  employee's  interest  in

1  expression outweighs the employer's interest in regulating the

2  workplace.  Rivero v. City & County of San Francisco, 316 F.3d 857,

3  865 (9th Cir. 2002).   Whether particular speech qualifies for

4  constitutional protection is a question of law.  Wheaton v. Webb-

5  Petett, 931 F.2d 613, 618 (9th Cir. 1991) (citing Connick v. Myers,

6  461 U.S. 138, 148 n.7, 150 n.10)).

7       As the Supreme Court recently explained,

8            Pickering and the cases decided in its wake identify
        two inquiries to guide interpretation of the
9       constitutional protections accorded to public employee
        speech.  The first requires determining whether the
10      employee spoke as a citizen on a matter of public
        concern.  See id., at 568, 88 S. Ct. 1731.  If the answer
11      is no, the employee has no First Amendment cause of
        action based on his or her employer's reaction to the
12      speech.  See Connick, supra, at 147, 103 S. Ct. 1684.  If
        the answer is yes, then the possibility of a First
13      Amendment claim arises.  The question becomes whether the
        relevant government entity had an adequate justification
14      for treating the employee differently from any other
        member of the general public.  See Pickering, 391 U.S.,
15      at 568, 88 S. Ct. 1731.  This consideration reflects the
        importance of the relationship between the speaker's
16      expressions and employment.  A government entity has
        broader discretion to restrict speech when it acts in its
17      role as employer, but the restrictions it imposes must be
        directed at speech that has some potential to affect the
18      entity's operations.

19  Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006).

20      Most decisions applying the Pickering analysis have focused on

21  the "matter of public concern" portion of the first element, and

22  not the part the Supreme Court describes as "speaking as a

23  citizen." Garcetti makes clear that the status in which the public

24  employee speaks must be addressed separately from and in addition

25  to whether the public employee was addressing a matter of public

26  concern.  The Garcetti Court stated that "[s]o long as employees

27  are speaking as citizens about matters of public concern, they must

28  face only those speech restrictions that are necessary for their

17 - OPINION & ORDER

1 employers to operate efficiently and effectively." Id. at 1958.

2    Garcetti explained that the controlling factor in making this
3 determination about the status of the public employee while making
4 the statement at issue, is whether the expressions were made
5 pursuant to the employee's duties. Id. at 1959-60.  The Court
6 explicitly held that "when public employees make statements
7 pursuant to their official duties, the employees are not speaking
8 as citizens for First Amendment purposes, and the Constitution does
9 not insulate their communications from employer discipline." Id.
10 at 1960.

11    In Garcetti, the plaintiff was an assistant district attorney
12 whose specific assignment was as a "calendar deputy," which gave
13 him certain supervisory responsibilities over other lawyers.  A
14 defense attorney contacted the plaintiff about inaccuracies in an
15 affidavit used to obtain a search warrant.  After the plaintiff
16 investigated, he relayed his findings to his supervisors and
17 prepared a disposition memorandum explaining his concerns and
18 recommending dismissal of the criminal case in which the affidavit
19 had been presented.  A few days later, he submitted a supplemental
20 memorandum after a follow-up telephone call with the warrant
21 affiant.   Despite the plaintiff's concerns, the prosecution
22 proceeded.  The plaintiff alleged that following these events, he
23 was subjected to a series of retaliatory employment actions.

24    In analyzing the plaintiff's First Amendment retaliation
25 claim, the Court stated:

26         The controlling factor in Ceballos' case is that his
         expressions were made pursuant to his duties as a
27       calendar deputy. . . . That consideration - the fact that
         Ceballos   spoke   as   a   prosecutor   fulfilling   a
28       responsibility to advise his supervisor about how best to

18 - OPINION & ORDER

proceed with a pending case - distinguishes Ceballos'
case from those in which the First Amendment provides
protection against discipline. . . . .

Ceballos wrote his disposition memo because that is
part of what he, as a calendar deputy, was employed to
do. . . . The significant point is that the memo was
written pursuant to Ceballos' official duties.
Restricting speech that owes its existence to a public
employee's professional responsibilities does not
infringe any liberties the employee might have enjoyed as
a private citizen. . . .

Ceballos did not act as a citizen when he went about
conducting his daily professional activities, such as
supervising attorneys, investigating charges, and
preparing filings. In the same way he did not speak as
a citizen by writing a memo that addressed the proper
disposition of a pending criminal case. When he went to
work and performed the tasks he was paid to perform,
Ceballos acted as a government employee. The fact that
his duties sometimes required him to speak or write does
not mean his supervisors were prohibited from evaluating
his performance.

Id. at 1959.

The Court made clear that the fact that Ceballos expressed his

views inside his office, rather than publicly, was not dispositive

because employees in some cases may receive First Amendment

protection for expressions made at work.   Id. at 1958.   Also, the

Court explained that the fact that the memorandum prepared by

Ceballos concerned the subject matter of his employment was also

nondispositive because the First Amendment protects some

expressions related to the speaker's job.   Id.

The Court concluded its discussion by stating that "[p]roper

application of our precedents thus leads to the conclusion that the

First Amendment does not prohibit managerial discipline based on an

employee's expressions made pursuant to official responsibilities."

Id. at 1961.   The Court then noted that because the parties in the

case did not dispute that Ceballos wrote his memorandum pursuant to

19 - OPINION & ORDER

his employment duties, the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id.

Responding to a point made by Justice Souter in dissent, the majority continued:

> We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. . . . The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Id. at 1961-62.

In the only published Ninth Circuit post-Garcetti case, a female corrections officer brought Title VII claims and a First Amendment retaliation claim against her former employer. Freitag, 468 F.3d 528. Of relevance to the First Amendment claim, plaintiff alleged she was retaliated against for the following acts of speech: (1) reporting sexually hostile inmate conduct to agents of the California Department of Corrections, either formally or informally; (2) documenting Pelican Bay State Prison's responses or failures to respond to plaintiff's reports of sexually hostile inmate conduct; (3) informing the Director of the California Department of Corrections, of either the inmates' sexually hostile conduct or of Pelican Bay State Prison's responses or failures to respond; (4) informing a state senator of sexually hostile conduct or of the Pelican Bay State Prison's responses or failures to respond; (5) reporting either the sexually hostile conduct or the prison's responses or failures to respond to the Office of

20 - OPINION & ORDER

Inspector General; and (6) cooperating with the investigation conducted by the Office of the Inspector General.

The Ninth Circuit concluded that the plaintiff acted as a citizen when she wrote letters to the state senator and when she communicated with the Inspector General regarding her complaints of sexual harassment.  468 F.3d at 545.  The court noted that her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as public employee. Id.  The court stated that the plaintiff did not lose her right to speak as a citizen simply because she initiated the communications while at work or because they concerned the subject matter of her employment.  Id.

In contrast, the court concluded that the plaintiff's internal reports of inmate sexual misconduct and documentation of the prison's failure to respond were not constitutionally protected speech because she submitted those reports pursuant to her official duties as a correctional officer.  Id. at 546.  It was unclear to the appellate court whether plaintiff's letter to the Corrections Department Director was protected because the record did not reveal, one way or the other, whether prison guards were expected to air complaints regarding the conditions in their prisons, all the way up to the Director in Sacramento.  Id.  It remanded that issue to the district court.  Id.

Against this backdrop of new cases, Winters argues that plaintiff cannot establish that her speech was protected under the law announced in Garcetti because plaintiff was speaking as part of her official job duties.

21 - OPINION & ORDER

1          1.  Budget for Fiscal Year 2006

2          As detailed above, when plaintiff learned of a projected 9.1%

3  decrease in state funding for fiscal year 2006, she reported that

4  to Winters and others at the County.  In deposition, plaintiff

5  stated that she believed it was part of her job to report to the

6  County the proposed reduction in funding from the state.  Pltf's

7  Depo. at p. 74.  She also admitted that her job duties included

8  budgeting, and that she was required to have expertise in financial

9  discipline.  Id. at p. 41, 101.  Her written job description also

10 indicated that she was to oversee the budget for her assigned

11 division, and to assist the Chief Financial Officer (CFO) in

12 facilitating the fiscal, administrative, and budgetary tasks of the

13 division.  Exh. 2 to Short Declr. at p. 1.

14          2.  Cascadia

15         As noted above, plaintiff communicated her recommendation to

16 deny Cascadia's request for additional funding, to Winters and

17 others.  Plaintiff's job description included performance of duties

18 of assisting the CFO in facilitating the fiscal, administrative,

19 and budgetary tasks, and synthesizing, analyzing, and directing the

20 processing of essential information that impacts program

21 expenditures and revenues.  Id.  She was required to assist the CFO

22 in implementing, maintaining, and analyzing many department-wide

23 fiscal projects.  Id.  She also was charged with overseeing the

24 budget, finance, grants, accounting, payroll, purchasing,

25 contracting, and billings for the division, as well as monitoring

26 budgetary and fiscal activities to meet program objectives, and to

27 assist in negotiations and contractual relationships with agencies,

28 hospitals, provider networks, and practitioners.  Id.  She was to

22 - OPINION & ORDER

1  determine amounts and keep track of contracts, authorize invoices
2  for payment, monitor the MHASD budget, and identify issues and work
3  with the program manager to implement solutions.  Id.

4      As she testified, Stickel raised the Cascadia issue with her
5  early on in her tenure, and told her to watch them and make sure
6  they "toe the line."  When the actual requests for extra money were
7  made in November and December 2004, plaintiff formed a committee to
8  look into the problem.  Clearly, her investigation of the money
9  request, and her recommendation regarding it, were within her
10 specific job duties, as was communicating her recommendation to the
11 CFO (Stickel), and Winters, her immediate supervisor.

12          3.  ITS Billing Adjustment

13     Plaintiff believed that working on the Medicaid overpayment
14 problem that Ralph Summers at the state informed her of, was one of
15 her job duties.  She testified in deposition that her job duties
16 included understanding Medicaid compliance generally and working to
17 reduce the amount of the overpayments in this instance.  Pltf's
18 Depo. at p. 41, 44.  She also testified that generally, part of her
19 job was to make sure that money that was going out of the County
20 was going out in the correct way and that a fund that was supposed
21 to pay for a service was going to the right service.  Id. at p. 37.
22 She specifically stated that handling an issue "like this," meaning
23 the ITS/Medicaid overpayment, "where the State is saying there's
24 been a problem, there's a mistake, intentional or otherwise," was
25 part of her job assignment.  Id.

26          4.  ITAX

27     Based on plaintiff's job description as noted in the preceding
28 three sections, and her testimony as quoted or summarized in the

preceding paragraphs, it is clear that plaintiff's expression of concern regarding the ITAX and the restoration of certain state funding combining to "double fund" certain programs, was part of plaintiff's job duties as she admittedly was the budget person for her division, had responsibility for tracking funds and ensuring they were both coming in and going out appropriately, and reporting to the CFO.  E.g., Pltf's Depo. at p. 37 (plaintiff stating that during her interview for the position, her job was described to include making sure that money that was going out of the County was going out in the correct way and that a fund that was supposed to pay for a service was going to the right service); Exh. 2 to Short Declr. (written job description included task of synthesizing, analyzing, and directing the processing of essential information that impacts program expenditures and revenues; also included task of collaboration with program managers and state staff, as well as the CFO (Stickel) in determining revenues, developing internal allocations, identifying fiscal placement of new funding, and performing expenditure tracking and reconciliation).

Based on her testimony and the written job description, no reasonable juror could conclude anything but all of plaintiff's communications regarding the four subject areas, were pursuant to her official job duties.  Notably, plaintiff does not even mention Garcetti in her response memorandum.  Instead, she focuses her argument on the remaining parts of the test used to determine if the statement is constitutionally protected - was the statement related to an issue of public concern and the Pickering balancing test.

Plaintiff does argue that when she complained to Winters or

24 - OPINION & ORDER

1   Stickel to effectuate a change in something she thought was illegal
2   or unethical, she was "doing more than fulfilling her job duties.
3   She was, in fact, speaking out about matters of great public
4   concern." Pltf's Mem. at p. 16. But, that misses the point. The
5   test is not only whether she was speaking on an issue of public
6   concern. Garcetti discusses whether the communication for which
7   the plaintiff is allegedly being retaliated against, was made
8   pursuant to the employee's official job duties, which these were.

9        Finally, plaintiff contends that nowhere in her job
10  description or articulated job duties was she required to monitor
11  individual county employees' adherence to fiduciary laws and
12  regulations and to complain if she felt they were breaching such
13  obligations. This argument raises two problems. First, she
14  describes the duties too narrowly. Adopting plaintiff's position
15  here would mean that if a job description did not include the task
16  of "whistleblowing," any communication which could be considered as
17  whistleblowing could not be done pursuant to one's official job
18  duties. While I believe that Justice Souter has raised a
19  legitimate concern in his dissent about employers writing job
20  descriptions so broadly as to make every communication by a public
21  employee done in the context of an official job duty, plaintiff's
22  description here is an example of the other extreme which is too
23  narrow.

24       Second, plaintiff's communications were not about individual
25  county employees. They were about issues - what was the County
26  going to do about the double funding (ITAX and state restored
27  funding), overpayments for Medicaid, the 9.1% projected decrease in
28  funding, and Cascadia. Plaintiff's characterization of the essence

25 - OPINION & ORDER

of the communications is inaccurate and is not supported in the record.

I grant the motion as to Winters based on <u>Garcetti</u> and the fact that the record shows that plaintiff's communications at issue in the case were all made pursuant to her official job duties. Accordingly, I do not address Winters's alternative argument that plaintiff would have been terminated regardless of her speech in any event.

III.   ORS Claim Against the County

Plaintiff alleges that the County violated Oregon Revised Statute § (O.R.S.) 659A.203 by terminating her in retaliation for her opposition to the County's alleged illegal fiduciary practices. Compl. at ¶¶ 23-27.

Although the Complaint does not clearly identify the particular subdivision of the statute that plaintiff alleges was violated, in her memorandum in opposition to defendants' motion, she states that she "repeatedly and clearly spoke up to Winters, Stickel, and others at the County regarding information that she believed to be a violation of federal and/or state laws, as well as rules and/or regulations by the County." Pltf's Mem. at p. 18. Based on this statement, I understand her claim to be brought under O.R.S. 659A.203(1)(b)(A), which makes it an unlawful employment practice for a public employer to "[p]rohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of . . . [a] violation of any federal or state law, rule or regulation by the state, agency or political subdivision[.]"

26 - OPINION & ORDER

1    In the absence of controlling Oregon law, Judge Stewart has
2  applied the standards for a Title VII retaliation claim to similar
3  claims under the Oregon Whistleblower Act.  I agree with Judge
4  Stewart.  Thus, to establish a prima facie case on this claim,
5  plaintiff must show that (1) she engaged in protected activity; (2)
6  she suffered an adverse employment decision; and (3) she suffered
7  the adverse employment decision because she engaged in the
8  protected activity, that is, there is a causal link between her
9  activity and the employment decision.  Minter v. Multnomah County,
10 No. CV-01-352-ST, 2002 WL 31496404, at *6 (D. Or. May 10, 2002)
11 (noting that this district applies the Title VII retaliation
12 framework when assessing retaliation claims under the Oregon
13 Whistleblower Act and requiring that plaintiff prove, as a prima
14 facie case, that she was engaging in protected activity, that she
15 suffered an adverse employment decision, and that there was a
16 causal link between her activity and the employment decision),
17 adopted by Judge Haggerty, June 25, 2002.

18   Defendant moves for summary judgment on this claim based on
19 two arguments:  (1) plaintiff did not make a "disclosure" as that
20 term is used in the statute; (2) plaintiff had no reasonable belief
21 that the alleged misconduct violated any federal or state law, or
22 rule or regulation.  Both of these arguments go to the first prima
23 facie element requiring plaintiff to establish that she engaged in
24 protected conduct.

25   A.  Disclosure

26   The only Oregon case to address the definition of the word
27 "disclosure" as used in the statute, is Bjurstrom v. Oregon
28 Lottery, 202 Or. App. 162, 120 P.3d 1235 (2005).  There, the court

27 - OPINION & ORDER

1  concluded, based on the text of O.R.S. 659A.203 and indicators of
2  legislative intent, the word "disclosures" includes reports of
3  wrongdoing within an agency or department. Id. at 170-71, 120 P.3d
4  at 1240.

5      The Bjurstrom court was not confronted with the precise
6  argument defendants raise here.  Defendants contend that while
7  reports of wrongdoing made within the agency potentially may be
8  "disclosures" under the statute, they are not "disclosures" unless
9  they are made to a person who was previously unaware of the
10 information, meaning someone "in a supervisory position, other than
11 the wrongdoer himself." Huffman v. Office of Personnel Mgmt, 263
12 F.3d 1341, 1351 (Fed. Cir. 2001).

13     When Judge Stewart decided Minter in 2002, she noted that no
14 Oregon case had defined "disclosure" under the Oregon Whistleblower
15 Act. Minter, 2002 WL 31496494, at *7 n.3.  She noted that because
16 the Oregon Whistleblower Act is very similar to the federal
17 Whistleblower Protection Act of 1989, decisions concerning the
18 federal law are helpful in defining the sufficiency of the
19 disclosure. Id.  She then cited Huffman for the proposition that
20 reports of wrongdoing to supervisors are protected if made to a
21 person "'in a supervisory position, other than the wrongdoer
22 himself."' Id. (quoting Huffman, 263 F.3d at 1351).  In Minter, it
23 was undisputed that the plaintiff made a disclosure to a supervisor
24 other than the wrongdoer. Id.

25     In Huffman, the employee had made several "disclosures."  The
26 court first discussed the meaning of the term "disclosure" in the
27 context of resolving whether a complaint to a supervisor about the
28 supervisor's own conduct was protected under the federal

28 - OPINION & ORDER

1  whistleblower law.   The court noted that the term was not
2  explicitly defined (nor is it in the Oregon statute), and thus,
3  basic principles of statutory construction required the court to
4  give the term its ordinarily understood meaning. Huffman, 263 F.3d
5  at 1349.   After consulting a dictionary, the court stated that
6  disclosure was defined as "'the act or an instance of disclosing:
7  the act or an instance of opening up to view, knowledge, or
8  comprehension.'"  Id. (quoting Webster's Third New Int'l Dict. 645
9  (1968)).[2]  After reviewing further definitions from Webster's, the
10 court stated that the "term 'disclosure' means to reveal something
11 that was hidden and not known." Id. at 1349-50.   Thus, the court
12 continued, a report to a supervisor of the supervisor's own
13 wrongdoing, is not making a "disclosure" of misconduct.   Id. at
14 1350.  If the misconduct occurred, the wrongdoer necessarily knew
15 of the conduct already because he or she is the one that engaged in
16 the misconduct.  Id.

17      In contrast, the court concluded that complaints to a
18 supervisor about other employees' conduct or other matters was a
19 "disclosure" within the meaning of the statute, and it did not
20 matter whether the person to whom the matters were reported had
21 authority to correct the alleged wrongdoing.  Id. at 1351.

22      Relying on Huffman, defendants argue that plaintiff made no
23 disclosures.   Defendants contend that none of plaintiff's
24

25      [2] The Oregon case, Bjurstrom, cited to a different edition
26 of Webster's and stated that "[i]n common usage, the term
   'disclose' may be understood to mean, in a general sense, 'to
27 make known,' or to 'open up to general knowledge.'" Bjurstrom,
   202 Or. App. at 169, 120 P.3d at 1239 (quoting Webster's Third
28 New Int'l Dict. 645 (unabridged ed 2002)).

29 - OPINION & ORDER

communications disclosed unknown information to county employees. As to the Medicaid overpayments, defendants note that before Summers told plaintiff about it and before plaintiff communicated the information she received from Summers, to Winters, Pimental had already been working with Wirshup on the issue and thus, plaintiff's communication to Winters did not reveal something that was hidden and not known.

As to the projected 9.1% decrease in state funding, plaintiff learned about the issue at a "Rates & Finance" meeting and then reported it to Winters.  Though plaintiff was the first one to report it to Winters, defendants note that the proposed decrease was already known within the County.  The communication between plaintiff and Winters did not, therefore, reveal anything previously unknown.

As to the Cascadia finance issues, defendants note that the entire department knew about Cascadia's request for additional funds and the billing problems.  Defendants note that this was a problem identified before plaintiff was hired and thus, any communications she made about Cascadia's request for additional funds was not a disclosure of something previously unknown.

Finally, as to the ITAX issue, plaintiff testified in deposition that there were probably very few people in the County who were unaware that the ITAX had passed and that it was widely known that money had been partially restored from the state.  Thus, defendants argue, she was not disclosing anything that was not already well known.  More importantly, if plaintiff argues she "disclosed" the failure to return funds, the decision by the County Chair to transfer $500,000 to the general fund was known by the

30 - OPINION & ORDER

1  Chair, Stickel, and Pate, and thus any communication regarding that
2  decision was not disclosing anything that was not already known.

3      Plaintiff argues that "the record is replete with evidence
4  which demonstrates that Clarke did initially disclose several
5  pieces of information which she believed to be improper fiduciary
6  activities on the part of the County to Winters and Stickel."
7  Pltf's Mem. at p. 18.   At oral argument, plaintiff identified
8  testimony appearing at pages 119, 122, 125, 126, and 134 of her
9  deposition as the evidence she relied on.

10     I have carefully reviewed these pages, as well as the other
11 evidence in summary judgment record, and find no basis for
12 plaintiff's position that she made a disclosure within the meaning
13 of the statute.   First, the referenced pages of her deposition
14 concern only Cascadia, and none of the other subject areas.
15 Second, the referenced pages show that the thrust of plaintiff's
16 communication was that Cascadia was committing fraud by listing
17 funds as having been accrued when they were not.   Finally, there is
18 one reference to plaintiff having a concern that paying Cascadia
19 additional money from a certain fund might constitute fraud on the
20 County's part.   Pltf's Depo. at p. 134.   However, there is no
21 evidence that this was new information she provided to Winters,
22 Stickel, or anyone else at the County.

23     Moreover, Huffman teaches that revealing the illegality is not
24 enough to make a communication a disclosure.   The court explained:

25         To be sure, there may be situations where a government
          employee reports to the wrongdoer that the conduct of the
26         wrongdoer is unlawful or improper, and the wrongdoer,
          though aware of the conduct, was unaware that it was
27         unlawful or improper.   Nonetheless, the report would not
          be a protected disclosure.   It is clear from the statute,
28         . . . , that the disclosure must pertain to the

31 - OPINION & ORDER

> 1         underlying conduct, rather than to the asserted fact of
> 2         its unlawfulness or impropriety, in order for the
>         disclosure to be protected by the WPA.

3 <u>Huffman</u>, 263 F.3d at 1350 n.2.

4     Defendant has the better argument.  Although <u>Huffman</u> is not

5 binding, it is the more persuasive authority on the precise issue

6 presented by the facts in this case.  There is some distinction

7 between this case and <u>Huffman</u>, but not a material one.  The

8 plaintiff in <u>Huffman</u> made some disclosures to his supervisor about

9 that supervisor's alleged inappropriate conduct or mismanagement.

10     Here, plaintiff made communications to Winters, Stickel, and

11 others that did not always directly challenge their conduct.  But,

12 the reason the disclosures in <u>Huffman</u> were not actionable was

13 because by reporting bad conduct to the bad actor, the employee did

14 not reveal anything new and thus, did not make a "disclosure" as

15 the court had defined the word for purposes of the statute.

16 Applying that concept here, any of the communications for which

17 plaintiff says she was retaliated against related to topics or

18 issues already known to either the persons she reported to, or at

19 least to other supervisory persons within the County.  Thus, as in

20 <u>Huffman</u>, plaintiff did not disclose any information not previously

21 known.

22     I agree with defendants that plaintiff made no disclosures

23 within the meaning of the statute.  Thus, I decline to address

24 defendant's alternative argument that even if she had made a

25 disclosure, she lacked a reasonable belief that the conduct she

26 disclosed was a violation of law, regulation, or rule.  I grant

27 summary judgment to the County on the state statutory whistleblower

28 claim.

32 - OPINION & ORDER

1

CONCLUSION

2      Defendants' motion for summary judgment (#17) is granted.

3      IT IS SO ORDERED.

4                    Dated this __23rd_ day of ___March____, 2007.

5

6

7                                          _____
                                           Dennis James Hubel
8      _____   United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33 - OPINION & ORDER